Maren Ericson, ISB No. 9273
**HAMILTON, MICHAELSON & HILTY, LLP**
1303 12th Avenue Road
Nampa, ID  83686
(208) 467-4479 – Telephone
(208) 467-3058 – Facsimile
*mericson@nampalaw.com*

**ATTORNEYS FOR PLAINTIFF
SAVOYE APARTMENTS LLC**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **SAVOYE APARTMENTS LLC**  *Plaintiff*, v.  **ZIONS BANCORPORATION, N.A. dba ZIONS FIRST NATIONAL BANK**  *Defendant*. | **CASE NO.: _____**  **ORIGINAL COMPLAINT, APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTION, AND DEMAND FOR JURY TRIAL** |

**SAVOYE APARTMENTS LLC'S ORIGINAL COMPLAINT AND
APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff Savoye Apartments LLC ("Savoye") files this Original Complaint and Application for Preliminary and Permanent Injunction against Defendant Zions Bancorporation, N.A. dba Zions First National Bank ("Zions"), and would respectfully show the Court as follows.

## I. INTRODUCTION

1. Savoye is a special purpose entity that owns a dormitory-style student housing complex in Rexburg, Idaho.

2. In April 2016, Savoye sought financing to construct this housing complex. To that end, Savoye met with several representatives of Zions, a bank with a local branch near Rexburg, and requested assurances that, if Savoye obtained financing through Zions, Zions would provide certain "checks and balances" on the distribution of loan proceeds.

3. Zions repeatedly provided such assurances. Specifically, Zions represented that it would require supporting documentation, such as lien waivers and subcontractor invoices, prior to advancing funds under the loan. Zions also represented that it would conduct on-site inspections to ensure that any person to whom Zions advanced loan proceeds was properly using the funds. In reliance on these representations, Savoye agreed to obtain financing through Zions, foregoing other financing options.

4. To memorialize the parties' agreement, Zions provided Savoye with a stack of boilerplate loan documents. Zions, however, failed to update its standard loan documents to reflect the particular substance of the parties' entire agreement. For instance, the loan documents did not require that Zions establish loan advancement procedures or demand supporting documentation in response to draw requests. Nor did they require that Zions conduct on-site inspections. And they did not even mention subcontractor invoices. Nevertheless, in a hurry to get the loan finalized and without realizing the boilerplate documents had not been updated, the parties executed them.

5. It was not until a year later, in September 2018, that Savoye discovered the parties' mutual mistake. And its discovery came in the worst possible way: after learning that Zions had – contrary to their agreement – disbursed more than $1,000,000 of Savoye's loan proceeds without

requiring *any* supporting documentation.  Savoy also learned that its general contractor, the person to whom Zions made the unsupported advances, had converted approximately $800,000 of these funds for his personal use.

6. Confronted with this at the time, Zions admitted that it made a mistake and should have required supporting documentation prior to advancing loan proceeds to the general contractor.  Yet Zions now claims it did nothing wrong, conceding it never intended to keep the promises it previously made, pointing to the mutually-mistaken, boilerplate language of the loan documents as evidence of this belated concession.

7. On or about December 18, 2018, Savoye paid Zions $824,019—the balance of the loan less the amount that Zions' improper advances allowed Savoye's general contractor to steal, the interest that Savoye paid on that amount, and the lost rent that Savoye suffered as a result of Zions' improper loan disbursements.

8. Zions, disclaiming its prior representations and assurances, asserted that Savoye defaulted under the loan and initiated non-judicial foreclosure proceedings against the apartment complex.

9. Zions' allegations are meritless.  Savoye is not in default.  It has fully complied with all its contractual obligations to Zions – including paying all sums due thereunder after an offset for the harm caused by Zions' improper advances.  Savoye would accordingly suffer irreparable harm if the Court were to permit Zions to foreclose.  For these and other reasons provided more fully below, the Court should grant Savoye's application for a preliminary injunction and permanent injunction.

## II.   THE PARTIES

10.     Plaintiff Savoye Apartments LLC is a Wyoming limited liability company with its principal place of business in Idaho.

11.     Defendant Zions Bancorporation, N.A. dba Zions First National Bank is a Utah company that, on information and belief, maintains its principal place of business in Utah.  Zions may be served by delivering a copy of the summons and this complaint to its registered agent for service of process, Corporation Service Company, at 12550 W. Explorer Dr., Ste. 100, Boise, Idaho 83713.

### III.    JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction).

13.     The Court may exercise personal jurisdiction over Zions because Zions has minimum contacts with Idaho, and Savoye's claims arise from or relate to such contacts.  Zions' contacts include, without limitation, Zions' financing of the Rexburg student-housing complex and Zions' attempt to foreclose on the same.  Personal jurisdiction is also proper because the parties agreed, in their construction loan agreement and deed of trust, to submit claims arising thereunder to courts in Ada County.

14.     Venue is proper before the Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), as the events giving rise to Savoye's claims occurred in this judicial district.  Venue is also proper because the parties agreed, in their construction loan agreement and deed of trust, to submit claims arising thereunder to courts in Ada County.

### IV.    FACTUAL ALLEGATIONS

**A.     Zions assures Savoye that Zions will provide "checks and balances" on the distribution of loan proceeds.**

15. Savoye is a special purpose entity that owns a dormitory-style student housing complex in Rexburg, Idaho (the "Project"). *See* Affidavit of Mike Mielke, filed herewith as <u>Exhibit A</u> ("Mielke Aff."), at ¶ 3.

16. Like other capital-intensive businesses, Savoye borrows cash to fund its operations. <u>Ex. A</u> (Mielke Aff.), ¶ 4. Mike Mielke, one of Savoye's principals, is responsible for obtaining such financing. *Id*. Mr. Mielke explored several potential sources of financing for the Project, including making Savoye a personal loan. However, wanting to play a passive role in the construction of the Project, Mr. Mielke ultimately sought out a financing partner that would play an active role in vetting the disbursement of construction advances.

17. To that end, in April 2016, Mr. Mielke met with Henry Jones, a loan officer at Zions' branch in Jackson Hole, Wyoming. *Id*. ¶ 5. At these meetings, Mr. Mielke explained that, due to the passive role he intended to play in the Project, Savoye needed to secure a loan from a bank that could provide appropriate "checks and balances" on the distribution of loan proceeds. *Id*. Specifically, Mr. Mielke explained that Savoye needed financing and oversight from a bank that had a local office in or near Rexburg. *Id*.

18. Mr. Jones assured Mr. Mielke that Zions could satisfy these requirements, confirming that Zions had a branch based in Idaho Falls that would specifically accommodate his needs. *Id*. ¶ 6. Mr. Jones then connected Mr. Mielke with Allen Woolley, a Zions' representative in its Idaho Falls location. In their subsequent conversations, Mr. Woolley underscored what Mr. Jones earlier had: that Zions would carefully vet loan advances and ensure they would only be provided in response to draw requests supported by adequate paperwork.

19. *First*, on May 2, 2016, Mr. Jones and Mr. Mielke spoke with Allen Woolley, a representative of Zions' Idaho Falls branch, via teleconference. During that call, Mr. Mielke

inquired whether Zions would safeguard Savoye's loan proceeds against improper or unsupported requests for disbursement. *Id*. As Mr. Jones had previously done, Mr. Woolley confirmed that Zions would provide such safeguards. *Id*. He explained that Zions requires, as part of its loan advancement policies, subcontractor lien waivers and invoices before it will process disbursement requests. *Id*. He also noted that Zions would provide periodic on-site inspections to ensure that persons to whom Zions disbursed loan proceeds were properly using the funds. *Id*.

20. ***Second***, on December 15, 2016, Mr. Jones and Mr. Mielke had another conference call with Allen Woolley to discuss Zions' loan advancement policies and financing requirements. Ex. A (Mielke Aff.), ¶ 7. On this call, Mr. Mielke again underscored his requirements, asking Zions to confirm it would provide checks and balances against the distribution of Savoye's loan proceeds. Mr. Woolley again confirmed that Zions would. *Id*.

21. ***Third***, on December 23, 2016, James Hirrlinger, Kelly McCandless, Mr. Mielke (together, "Savoye Partners"), and Mr. Woolley met in Idaho Falls to execute an operating agreement in connection with the Project.[1] *Id*. ¶ 8. The Savoye Partners and Mr. Woolley then went to the SnakeBite Restaurant, where they discussed the Savoye Partners' respective roles in the construction of the student housing complex. *Id*. During this discussion, Mr. Mielke again expressed that, because he would be taking a passive role in the Project, Savoye needed to secure a loan from a bank that could provide appropriate oversight and "checks and balances" on loan proceeds distribution. *Id*. For at least the third time, Mr. Woolley assured Mr. Mielke that Zions would provide such checks and balances. *Id*.

---

[1] Exhibit A to the operating agreement expressly acknowledged that Mr. Mielke was responsible for obtaining financing in connection with the Project and that he would otherwise be taking a passive role in such Project.

22. In reliance on these representations, Mr. Mielke agreed to finance the Project through Zions, foregoing other financing options. *Id.* ¶ 9.

**B.  The parties execute agreements mistakenly disclaiming Zions' representations to Savoye.**

23. To ostensibly memorialize the parties' agreement, on or about May 2017, Zions provided the following loan documents (collectively, "Agreements"):

    a.  Construction Loan Agreement ("CLA"), a true and correct copy of which is filed herewith as Exhibit B;

    b.  Promissory Note, a true and correct copy of which is filed herewith as Exhibit C;

    c.  Construction Deed of Trust and Fixture Filing ("Deed of Trust"), a true and correct copy of which is filed herewith as Exhibit D; and

    d.  Construction Loan Disbursement and Lien Waiver Procedures ("Lien Waiver Procedures"), a true and correct copy of which is filed herewith as Exhibit E.

24. These Agreements, however, contained Zions' standard boilerplate language and had not been updated to reflect the substance of the parties' entire agreement. For instance, instead of affirming Zions' agreement to only disburse loan proceeds with appropriate documentation, the boilerplate documents provided that this was something that Zions ***may*** do but didn't ***have*** to do:

    a.  "[Zions] may fund any draw request without requiring the submission of Lien Waivers." Ex. E (Lien Waiver Procedures) at 1;

    b.  "It is not [Zions'] general practice to require the submission of Lien Waivers with every draw request." *Id.*;

    c.  "[Zions] may, in its sole discretion . . . condition the funding of any or all draw requests on the submission of Lien Waivers as part of each draw procedure." *Id.*;

    d.  "[Zions] may, in its sole discretion, refuse to fund any draw request or partial draw request for which the Lien Waivers have not been properly prepared and executed, and upon request submitted for inspection and review." *Id.*;

    e.    "The Lien Waivers submitted to [Zions] are for [Zions'] sole information, use, reliance and benefit." *Id*.

    f.    "All information supplied to [Zions] is for [Zions'] protection only and no other party is entitled to rely on such information." <u>Ex. B</u> (CLA) at 15;

    g.    "There is no duty for [Zions] to review, inspect, supervise or inform [Savoye] of any matter with respect to [Savoye's] business. [Zions] and [Savoye] intend that [Zions] may reasonably rely on all information supplied by [Savoye] to [Zions] . . . without investigation or confirmation by [Zions] and that any investigation or failure to investigate will not diminish [Zions'] right to so rely." *Id*.;

    h.    "[Zions'] approval or disbursement of any Advance shall not constitute or be interpreted as [Zions'] . . . approval or acceptance of . . . documents submitted in support of the corresponding Request for Advance . . ." *Id*. at 11;

    i.    "[Zions] has no liability whatsoever for the collection, completeness, or satisfaction of any Lien Waivers submitted to [Zions] . . ." <u>Ex. E</u> (Lien Waiver Procedures) at 1;

    j.    "All . . . Lien Waivers are the sole responsibility of [Savoye] as to their preparation, collection, and submission to [Zions]." *Id*.;

    k.    "Should [Savoye] . . . want to confirm that the General contractor has obtained proper and complete Lien Waivers, [Savoye] shall include all such requirements in its contract with the General Contractor and may not look to [Zions] for such processes and procedure." *Id*.; and

    l.    "[Savoye] acknowledges and is hereby put on notice that [Zions] is not the agent or representative of [Savoye] nor acting on [Savoye's] behalf in connection with the Lien Waivers." *Id*.

25.    Because the parties were in a hurry to execute the loan documents, however, neither Savoye nor Zions noted – or corrected – this incorrect language in the loan documents. Instead, Savoye executed the documents, believing (mistakenly) that it contained language memorializing their actual agreement. <u>Ex. A</u> (Mielke Aff.) ¶ 10. Zions did not correct that understanding. *Id*.

26.    As such, between May 31 and June 19, 2017, Savoye and Zions executed the Agreements, under which Zions made $2,048,000 in loan proceeds available to Savoye in

exchange for a security interest in the Project.  *See* Exhibits B-D.  The Agreements had a maturity date of December 1, 2018, but the parties extended such date to March 31, 2019. *See* Letter from Zions to Savoye dated February 21, 2019, a true and correct copy of which is filed herewith as Exhibit F, at 1.

**C.  Savoye loses hundreds of thousands of dollars due to Zions' failure to require supporting documentation prior to advancing loan proceeds.**

27. In September 2018, approximately fourteen months after the parties executed the Agreements, Savoye discovered that Zions had not honored its agreement to require supporting documentation for draw requests. Ex. A (Mielke Aff.) ¶ 11.  Instead, Zions had disbursed approximately ***$1,343,756*** to Savoye's general contractor without requiring ***any*** lien waivers or subcontractor invoices.  *Id*.  Zions' failure to require such documentation enabled Savoye's general contractor to obtain and convert for his personal use ***at least $789,119*** of Savoye's loan proceeds.[2] *Id*.  In the absence of these proceeds, Savoye was not able to pay its subcontractors on time and suffered ***at least $336,000*** in lost rents.  *Id*.

28. Significantly, when confronted with this, Zions did not deny its earlier promises to establish and comply with loan advancement procedures. Ex. A (Mielke Aff.) ¶ 12.  Rather, Zions explicitly acknowledged that it had made a mistake, noting in writing that it "prematurely sent out the funds" and that it should have "disburse[d] in a line item percent complete basis [only] once we receive[d] invoices and lien waivers."  *See* Email from Travis Wilkinson to James Hirrlinger dated October 18, 2018, a true and correct copy of which is filed herewith as Exhibit G, at 1. Zions then blamed this mistake on the fact that the employee responsible for loan advancements "didn't

---

[2] The Salt Lake City Division of the Federal Bureau of Investigation is currently investigating the general contractor for bank fraud in connection with these events. The case number is Pocatello RA Case #318E-SU-3067268.

realize we require lien waivers." *See* Email from Travis Wilkinson to James Hirrlinger dated October 23, 2018, a true and correct copy of which is filed herewith as Exhibit H, at 1.

29. Unfortunately, once Zions became aware of the magnitude of its error and the harm it had caused Savoye, it "lawyered up," and began denying that it had made the prior representations. Instead, pointing to the language in the Agreements, Zions insisted it never intended to keep these prior promises. *See* Letter from Zions to Savoye dated December 28, 2018, a true and correct copy of which is filed herewith as Exhibit I, at 1 (writing that Savoye's principals are "experienced businessmen [who] cannot escape their responsibilities under the written loan documents.").

**D. Zions refuses to negotiate and initiates non-judicial foreclosure proceedings.**

30. On or about December 18, 2018, and to satisfy its remaining obligations under the Agreements, Savoye paid Zions $824,019—the balance of the loan less (1) the amount that Zions advanced without supporting documents, (2) lost rent that Savoye suffered as a result of Zions' actions, and (3) interest that Savoye paid on the amounts that Zions improperly advanced. Ex. A (Mielke Aff.) ¶ 13. As Savoye explained in a letter accompanying such payment, Savoye sought only for the parties to occupy the positions they would have otherwise occupied had Zions honored the parties' agreement. *Id.*

31. In response, Zions again disclaimed its prior agreement and demanded that Savoye pay the amount that Zions had advanced without supporting documentation and in violation of that agreement. Ex. I (Letter) at 4-5. Zions thereafter refused to engage in any discussions with Savoye regarding this issue.

32. On or about May 1, 2019, Zions claimed that Savoye was in default of the Agreements and initiated non-judicial foreclosure proceedings against the Project in Madison

County, Idaho. Ex. A (Mielke Aff.) ¶ 14; *see also* Notices of Default and Trustee's Sale, true and correct copies of which are filed herewith as Exhibit J and Exhibit K, respectively. These proceedings are scheduled to occur at 11:00 a.m. on August 30, 2019. Ex. K at 1.

33. Savoye is not in default of the loan, having paid all sums due to Zions' thereunder, subject to an offset for the harms caused by Zions' misconduct, and Savoye would be irreparably harmed if the Court permitted Zions to proceed with non-judicial foreclosure proceedings. Ex. A (Mielke Aff.) ¶ 15. Such proceedings would disrupt Savoye's business, damage its goodwill, and cause Savoye to lose a unique real property interest. *Id*. Money damages could not remedy this collective harm.

## V.   CAUSES OF ACTION

### COUNT ONE: FRAUD IN THE INDUCEMENT

34. Savoye re-alleges and incorporates the preceding paragraphs by reference as if fully set forth herein.

35. Zions represented and promised to Savoye that Zions would require supporting documentation, including, but not limited to, lien waivers and subcontractor invoices, prior to advancing Savoye's loan proceeds.

36. As Savoye emphasized in its initial discussions with Zions, these representations and promises were material to Savoye's decision to execute Zions' loan documents.

37. Zions has subsequently disclaimed these representations and promises, conceding that, at the time it made them, it knew the representations were false and it never intended to keep them.

38. Zions knew that Savoye would only do business with a bank that complied with certain loan advancement procedures, and Zions intended for Savoye to rely on Zions' representations that it would comply with such procedures.

39. Savoye did not know or have reason to know that Zions' representations were false.

40. Savoye justifiably relied on Zions' repeated representations that it would require supporting documentation prior to advancing Savoye's loan proceeds.

41. Because of Zions' failure to require such documentation, Savoye has suffered hundreds of thousands of dollars in damages.

## COUNT TWO: MUTUAL MISTAKE

42. Savoye re-alleges and incorporates the preceding paragraphs by reference as if fully set forth herein.

43. At the time the parties executed the Agreements, both parties believed that such Agreements required that Zions demand subcontractor invoices and lien waivers prior to advancing loan proceeds.

44. This belief was a mistake.

45. Furthermore, and as set forth in more detail above, the parties' mistake was material. The parties understood that the "checks and balances" for which Savoye had bargained were substantial and fundamental, such that the absence of such checks and balances from the Agreements defeated the object of the parties.

46. Accordingly, the parties' execution of these loan documents was a mutual mistake and these documents should be reformed so they are consistent with the parties' intended agreement.

## COUNT THREE: UNILATERAL MISTAKE

47. Savoye re-alleges and incorporates the preceding paragraphs by reference as if fully set forth herein.

48. At the time Savoye executed the Agreements with Zions, Savoye believed that such Agreements memorialized the parties' understanding that Zions was to require supporting documentation prior to advancing Savoye's loan proceeds.

49. This belief was a mistake.

50. Zions knew at the time the parties executed the Agreements that Savoye mistakenly believed that such Agreements imposed a duty upon Zions to require supporting documentation prior to advancing Savoye's loan proceeds.

51. Furthermore, and as set forth in more detail above, this mistake was material. The parties understood that the "checks and balances" for which Savoye had bargained were substantial and fundamental, such that the absence of these checks and balances from the Agreements defeated the object of Savoye.

52. Accordingly, Savoye's execution of Agreements was a unilateral mistake and the Agreements should be reformed so they are consistent with Savoye's intended agreement.

## VI. REQUEST FOR PRELIMINARY AND PERMANENT INJUNCTION

53. Savoye re-alleges and incorporates the preceding paragraphs by reference as if fully set forth herein.

54. Savoye respectfully requests that the Court set Savoye's application for preliminary injunction for hearing and, after such hearing, enjoin Zions and its agents, representatives, and all other persons in active concert or participation with it who receive actual notice of the order by personal service or otherwise on the following terms:

> a. Zions shall not foreclose on the Project or exercise any other remedy provided for in the Agreements based on Savoye's alleged breach of contract.

55. Savoye is entitled to the temporary injunctive relief requested herein pursuant to Federal Rule of Civil Procedure 65. Savoye has a probable right to relief and will suffer irreparable harm if the Court does not enjoin Zions from foreclosing on Savoye's real property pending trial on the merits.

56. Moreover, given that Savoye is obligated, under the Agreements, to pay Zions' attorneys fees *and* the balance of the loan should Zions prevail at trial (Ex. E (Deed of Trust) at 6), Zions stands only to suffer minor delay from the issuance of a preliminary injunction. The balance of the equities therefore tips in favor of Savoye. For the same reason, and because of Idaho's interest in ensuring that "those who seek to invoke the power of the law have the right to do so," the public interest factor also weighs in favor of Savoye. *Labossiere v. GMAC Mortg.*, No. 1:10-CV-00330-EJL, 2010 WL 2836107, at *4 (D. Idaho July 16, 2010) ("When assessing the public interest the Court must be cognizant not only of the public's interest in efficiency but also in ensuring basic safeguards.").

57. Finally, upon trial on the merits, Savoye requests that the Court enter a permanent injunction against Zions on the same terms and grounds as above.

## VII.     DEMAND FOR JURY TRIAL

58. Pursuant to Federal Rules of Procedure 38(a) and 38(b), Savoye hereby demands a trial by jury on all issues raised in this action.

## VIII.     PRAYER

For these reasons, Savoye respectfully requests that the Court award Savoye: (i) reformation of the loan documents so they are consistent with the parties' actual agreement; (ii)

preliminary and permanent injunctive relief; (iii) Savoye's actual and consequential damages from Zions' wrongful conduct; and (iv) such other and further relief to which Savoye may show itself justly entitled.

DATED this 18th day of June, 2019.

                          HAMILTON, MICHAELSON & HILTY, LLP

                          /s/ *Maren Ericson*
                          MAREN ERICSON
                          HAMILTON, MICHAELSON & HILTY, LLP
                          Attorneys at Law
                          1303 12th Avenue Road
                          Nampa, ID  83686
                          (208) 467-4479 Telephone
                          (208) 467-3058 Facsimile
                          *mericson@nampalaw.com*
                          Attorneys for Plaintiff